UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

MIKE ANGEL MARTINEZ,

        Plaintiff,

v.                                    CASE NO. 3:18-cv-1359-J-MCR

COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION,

        Defendant.

_____/

## MEMORANDUM OPINION AND ORDER[1]

**THIS CAUSE** is before the Court on Plaintiff's appeal of an administrative

decision denying his applications for a period of disability, disability insurance

benefits ("DIB"), and supplemental security income ("SSI"). Following an

administrative hearing held on August 16, 2018, the assigned Administrative Law

Judge ("ALJ") issued a decision,[2] finding Plaintiff not disabled from May 30,

2008, the alleged disability onset date, through September 13, 2018, the date of

---

[1] The parties consented to the exercise of jurisdiction by a United States Magistrate Judge. (Doc. 19.)

[2] Previously, the ALJ issued a decision (after a hearing held on November 26, 2013), finding Plaintiff not disabled from May 30, 2008, the alleged disability onset date, through April 3, 2014, the date of that decision. (Tr. 2-44, 62-72.) The Appeals Council affirmed the ALJ's April 3, 2014 decision, but on appeal to this Court, the ALJ's April 3, 2014 decision was reversed and remanded for further proceedings. (*See* Tr. 45-47, 544-54.) Because Plaintiff filed a claim for DIB on October 29, 2015, in its remand order of February 3, 2018, the Appeals Council directed the ALJ to "consolidate the claims files, associate the evidence, and issue a new decision on the consolidated claims." (Tr. 562-63.) The ALJ's new decision, issued on September 13, 2018, is currently under review.

the ALJ's decision.[3]  (Tr. 203, 207, 270, 453-94, 701.)  Based on a review of the record, the briefs, and the applicable law, the Commissioner's decision is **REVERSED and REMANDED**.

## I.    Standard of Review

The scope of this Court's review is limited to determining whether the Commissioner applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the Commissioner's findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).  Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.  *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995); *accord Lowery v. Sullivan*, 979 F.2d

---

[3] Plaintiff had to establish disability on or before September 30, 2013, his date last insured, in order to be entitled to a period of disability and DIB.  (Tr. 453.)

835, 837 (11th Cir. 1992) (stating the court must scrutinize the entire record to determine the reasonableness of the Commissioner's factual findings).

## II. Discussion

Plaintiff contends that the ALJ erred by failing to evaluate the opinion evidence consistent with the regulations, Agency policy, and Eleventh Circuit precedent, which was further compounded by the ALJ's failure to consider Plaintiff's need for a supportive living environment. Plaintiff points out that the opinions of his treating psychiatrist, Dr. Madkaiker, and the examining licensed psychologist, Dr. Nay, establish far greater limitations than assessed by the ALJ. Plaintiff adds that the ALJ erred in giving little or some weight to Dr. Madkaiker's treating opinions and little weight to Dr. Nay's examining opinions, which were consistent with each other and the other medical evidence, while according significant or substantial weight to the outdated opinions of the State agency non-examining medical consultants. Plaintiff points out that the ALJ never requested an updated review of the record by a State agency consultant and did not arrange for a consultative examination[4] of Plaintiff. Plaintiff further argues that the ALJ erred by failing to consider Plaintiff's need for a supportive living environment and/or need for ongoing accommodations related to his mental impairments. Defendant responds that substantial evidence supports the ALJ's evaluation of the medical and non-medical opinions of record, as well as the

---

[4] The only consultative examination in this case was performed by Dr. Nay upon referral by Plaintiff's counsel.

3

ALJ's finding that Plaintiff can perform a reduced range of medium work without the presence of a family member as a condition to performing that work.

## A. Standard for Evaluating Opinion Evidence

The ALJ is required to consider all the evidence in the record when making a disability determination. *See* 20 C.F.R. §§ 404.1520(a)(3), 416.920(a)(3). With regard to medical opinion evidence, "the ALJ must state with particularity the weight given to different medical opinions and the reasons therefor." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011). Substantial weight must be given to a treating physician's opinion unless there is good cause to do otherwise. *See Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).

"'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004). When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the medical evidence supporting the opinion, (4) consistency of the medical opinion with the record as a whole, (5) specialization in the medical issues at issue, and (6) any other factors that tend to support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(2)–(6), 416.927(c)(2)–(6).

Although a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion, *see Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir. 1984) (per curiam), 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2), "[t]he opinions of state agency physicians" can outweigh the contrary opinion of a treating physician if "that opinion has been properly discounted," *Cooper v. Astrue*, No. 8:06-cv-1863-T-27TGW, 2008 WL 649244, *3 (M.D. Fla. Mar. 10, 2008). Further, "the ALJ may reject any medical opinion if the evidence supports a contrary finding." *Wainwright v. Comm'r of Soc. Sec. Admin.*, No. 06-15638, 2007 WL 708971, *2 (11th Cir. Mar. 9, 2007) (per curiam); *see also Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985) (per curiam) (same).

"The ALJ is required to consider the opinions of non-examining state agency medical and psychological consultants because they 'are highly qualified physicians and psychologists, who are also experts in Social Security disability evaluation.'" *Milner v. Barnhart*, 275 F. App'x 947, 948 (11th Cir. 2008) (per curiam); *see also* SSR 96-6p[5] (stating that the ALJ must treat the findings of State agency medical consultants as expert opinion evidence of non-examining sources). While the ALJ is not bound by the findings of non-examining physicians, the ALJ may not ignore these opinions and must explain the weight given to them in his decision. SSR 96-6p.

---

[5] SSR 96-6p has been rescinded and replaced by SSR 17-2p effective March 27, 2017. However, because Plaintiff's applications predated March 27, 2017, SSR 96-6p was still in effect on the date of the ALJ's decision.

### B. Relevant Evidence of Record

### 1. Satyen P. Madkaiker, M.D.

Dr. Madkaiker has treated Plaintiff since October 2, 2008. (Tr. 317.) On April 12, 2011, Dr. Madkaiker wrote a note, stating that considering Plaintiff's chronic condition, he would "need treatment for several more years." (Tr. 298.)

On December 5, 2012, Dr. Madkaiker completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) ("MSS"). (Tr. 348-51.) In the MSS, Dr. Madkaiker opined, *inter alia*, that Plaintiff was extremely limited in the ability to understand, remember, and carry out complex instructions, and to make judgments on complex work-related decisions; he was markedly limited in the ability to make judgments on simple work-related decisions and the ability to interact appropriately with the public; and he was moderately limited in the ability to interact appropriately with supervisors and co-workers, and the ability to respond appropriately to usual work situations and to changes in a routine work setting. (Tr. 348-49.) Dr. Madkaiker explained:

> [Patient] has many [years] of chronic symptoms – [with] multiple hospitalizations [and] only moderate improvement [with] various medication interventions over the years. . . . Also, as far as [work] – [patient] tried in the past to be successful [at] the most basic of jobs, although never successful due to chronic symptoms of psychosis, [depression, and] anxiety.
> . . .
> [Patient and] family have had [three] major deaths in the family, which have exacerbated [patient's] symptoms. [Patient] cannot drive more than a block or two [and] has difficulty going out of the house [and] being around people outside the family. [Illegible] of psychosis, [depression, and] anxiety.

. . .
[Patient] has paranoid schizophrenia [with] several [negative and] positive symptoms.  Although his delusions [and] hallucinations have been controlled, he continues to have severe apathy, lack of drive [and] inability to function in a social/[work] setting.

(*Id.*)  Dr. Madkaiker also opined that Plaintiff was unable to manage benefits in his own best interest and explained that Plaintiff's mother assisted with his finances and everyday affairs, including medication management.  (Tr. 351.)

## 2.    Richard E. Nay, Ph.D.

On November 20, 2017, Dr. Nay performed a psychological evaluation of Plaintiff in order to assess his suitability for Social Security benefits.  (Tr. 1014-21.)  Dr. Nay's opinions were based on a clinical interview, behavioral observations, Mini Mental State Examination (MMSE), selected subtests of the Repeatable Battery for the Assessment of Neuropsychological Status (RBANS), the DSM-V Cross Cutting Symptom Measure (CCSM), and review of Dr. Madkaiker's February 6, 2012 MSS and February 22, 2012 letter, and Ms. Cowart's December 26, 2013 correspondence.  (Tr. 1014.)

Under Behavioral Observations, Dr. Nay stated, in relevant part:

Mr. Martinez . . . was accompanied to the evaluation by his mother, Myriam Muniz, who drove him to the evaluation.  Mr. Martinez appeared quite anxious upon meeting the examiner, and requested that his mother be able to accompany him into the evaluation proper, which was allowed given his obvious level of hesitation and anxiety about the evaluation.  He presented with a flat affect, and exhibited poor eye contact, frequently averting his vision.  His overall demeanor was noted to be very intense and serious, and he was observed to fidget frequently in his chair.  His immediate answers to questions were often short and terse, and he often looked at/deferred to his mother for assisting him in answering interview

questions.  As Mr. Martinez was noted to be a poor historian for specific information and dates, his mother answered many questions for him.  . . .  Mr. Martinez appeared to exhibit an adequate test-taking effort, and current test data is considered to be a valid estimate of current cognitive functioning.

(Tr. 1014-15.)

As part of the Relevant Background Information, Dr. Nay noted, *inter alia*:

[Mr. Martinez] first sought psychiatric help in approximately 1988, and was placed in a psychiatric hospital for approximately one week in Titusville.  At this time, he stated "I was hearing voices that told me bad things about myself . . . I thought the world was going to end."  From this point forward, Mr. Martinez began seeing a psychiatrist on a monthly basis for medication management.  He stated he also experienced two subsequent psychiatric hospitalizations in Jacksonville, secondary to symptoms of schizophrenia, in 2013 and 2014.  Mr. Martinez reports that he has been seeing psychiatrist Dr. Satyan Madkaiker every three months since 2014.  Prior to Dr. Madkaiker, he had seen two other psychiatrists over a period of many years, but was unable to remember their names.

(Tr. 1015.)

With respect to his work history:

Mr. Martinez stated he last worked in 2007, adding that he had to quit work because of his psychiatric symptoms.  In this regard, he added "I felt shaky, panicky . . . I didn't feel good . . . I had bad thoughts and paranoia."  At the time he quit working in 2007, he had been employed as a part-time bagger at a Publix supermarket (26 hours per week) for 18 years.  Mr. Martinez has not worked at all since 2007.

(Tr. 1017.)

As to his daily activities, Plaintiff explained he spent his time watching

television, reading, playing solitaire, and doing crosswords.[6]  (*Id.*)  Further:

> He stated he leaves home only 2-3 times per week usually to take his mother shopping.  He stated[,] "I leave home for doctors['] appointments also, but for no other reasons."  Mr. Martinez does no cooking.  He stated he engages in limited cleaning, adding "I do minimal sweeping once in a while . . . Sometimes I help my mother clean."  Mr. Martinez stated he rarely goes shopping, and almost always with a family member if he does go to a store.  He stated he does have a current driver's license, but only drives close to his home, as frequently as two times per week.  In this regard, he stated[,] "I don't feel comfortable driving any further."  . . .  He does not use any form of public transportation, and added "I'm not sure I could get on a bus alone . . . I get lost."

(*Id.*)  Then, "[w]hen asked specifically why he feels he is unable to be gainfully

employed at the present time, Mr. Martinez replied[,] '[I]f anyone else was around

I would get really nervous . . . I'm afraid it would all happen again, and I would

[e]nd up in a psychiatric hospital.'"  (*Id.*)

Next, Dr. Nay summarized the results of the various tests as follows:

> [T]he results of the MMSE indicated a total MMSE score of 28/30, which by itself is not indicative of significant cognitive impairment. Test results did indicate that Mr. Martinez . . . was unaware what county he was in with respect to orientation to place.  Also, and significantly, he was completely unable to perform a simple serial sevens task, adding "math has always been very hard for me."  . . . It is important to remember that the MMSE is only a very gross indicator of overall mental status . . . .   Thus, a more discriminating instrument was employed in this regard, the RBANS.
> . . .
> [T]he results of the RBANS indicated that all three measured areas of cognitive functioning, including short-term/immediate memory, attention/concentration, and delayed memory/recall, all fall into the very low range of cognitive functioning, suggesting severe impairment in all three areas.  The results of the delayed memory

---

[6] The medical records reflect that Plaintiff spent his time watching television, listening to music, and coloring.  (*See, e.g.*, Tr. 843, 845, 852.)

index scores suggest that Mr. Martinez does not benefit from repeated administrations of the same stimuli, indicating he would require frequent, ongoing repetitions of any new material to be learned. These findings certainly corroborate Mr. Martinez'[s] self-report of having significant difficulties with memory and retention of information.

. . . The following CCSM domains received a score of either "moderate" or "severe": [d]epression, feelings of irritation, anxiety, somatic complaints, and difficulties with memory.

(Tr. 1018-19.)

Under Summary and Diagnostic Impressions, Dr. Nay cited some of Dr. Madkaiker's records and Ms. Cowart's statements regarding Plaintiff's functioning, and then stated, in relevant part:

In light of all of this information, which is quite consistent, this examiner concurs that the most appropriate diagnosis for this man is schizoaffective disorder, depressed type, chronic. He also suffers with various anxiety-based symptoms, and yet may not qualify for a full diagnosis of any one particular anxiety disorder. Hence, the more general diagnosis of anxiety disorder NOS is most appropriate. Mr. Martinez is extremely dependent on his mother and other family members, and his sense of security can become easily threatened if he attempts to venture away from his home. He has an extremely poor stress coping response, and his feelings of depression and anxiety can quickly become exacerbated to the point of severe depression and even panic attacks, in response to even minimal stressors. It is important to note that the above statements are true even though this man takes multiple psychotropic medications and has done so for many years. Overall, his symptoms of psychosis, including delusional thinking and hallucinations, appear[] to be fairly well controlled with medications at this point, but could quickly deteriorate if he forgot to take medications or there was any change in his medication regimen. In addition to all of the aforementioned psychiatric issues and psychosocial limitations noted, Mr. Martinez also experiences significant, even severe impairments in short-term/immediate memory, attention/concentration, and delayed memory/recall. Consistent with findings of the attached medical records, Mr. Martinez would require constant reminders and cues in order to complete even the simplest of tasks. Indeed, his very

limited work history suggests that he was unable to continue performing a very simple, routine job (i.e., []bagger), as his psychiatric symptoms and poor stress coping response made any type of work impossible for this man.  Based on all of the above information, including interview information, behavioral observations, current testing, and a complete review of attached medical records, it is the opinion of this examiner that Mr. Martinez is totally disabled from a psychological perspective, and is unable to perform in any job setting on a five[-]day [] week, eight[-]hour[-]day basis.  While the current medical records reviewed [] go back to 2012-13, it is this examiner's opinion this man was sufficiently disabled to preclude any work from the time he was forced to quit his job with Publix in 2007 up until the present.  It is possible that some of the cognitive dysfunction noted could be secondary to side effects of his multiple psychotropic medications, but it is extremely important to note that Mr. Martinez relies on these medications to maintain any sort of psychological stability in his life.

Based on all of the above information, the following DSM-IV diagnostic impressions are offered:

| | |
|---|---|
| Axis I: | Schizoaffective Disorder, Depressed Type, Chronic Anxiety Disorder NOS (Generalized Anxiety and Panic) |
| Axis II: | Dependent Personality Disorder |
| Axis III: | Type II Diabetes, High Cholesterol |
| Axis IV: | Current stressors: Financial, Ongoing Psychiatric Symptoms |
| Axis V: | Current GAF: 45   [H]ighest GAF over past year: 45 |

(Tr. 1020.)

On December 15, 2017, Dr. Nay completed a Mental MSS regarding Plaintiff's functioning.  (Tr. 1022-25.)  He reiterated Plaintiff's diagnoses and identified the following symptoms: anhedonia; decreased energy; inappropriate affect; feelings of guilt or worthlessness; poverty of content of speech; generalized persistent anxiety; mood disturbance; difficulty thinking or concentrating; psychomotor agitation; motor tension; autonomic hyperactivity; pathological dependence; persistent disturbances of mood or affect;

apprehensive expectation; paranoid thinking; emotional withdrawal or isolation; easy distractibility; memory impairment; oddities of thought, perception, speech, or behavior; perceptual or thinking disturbances at times; hallucinations or delusions at times; pathologically inappropriate suspiciousness at times; and recurrent severe panic attacks at times.  (Tr. 1022-23.)

Then, Dr. Nay opined, *inter alia*, that Plaintiff would be unable to perform the following tasks/functions on a regular, reliable, and sustained basis: remember work-like procedures; maintain attention for a two-hour segment; maintain regular attendance and be punctual; complete a normal workday and workweek without interruptions from psychologically based symptoms; respond appropriately to changes in a routine work setting; deal with normal work stress; understand, remember, or carry out detailed instructions; deal with the stress of semi-skilled and skilled work; and interact appropriately with the general public. (Tr. 1023-24.)

Dr. Nay also repeated some of the opinions expressed in his November 20, 2017 report.  (Tr. 1024-25.)  Specifically, he stated that "the severity of symptoms observed at present existed at least as far back as 2007."  (Tr. 1025.)

### 3.    State Agency Non-Examining Consultants

On March 14, 2012, based on a review of the records available as of that date, B. Lee Hudson, Ph.D., a State agency non-examining consultant, completed a Psychiatric Review Technique, opining, in relevant part, that Plaintiff had a mild limitation in activities of daily living and a moderate limitation in social

functioning and concentration, persistence, or pace.  (Tr. 85-86.)  The same day, Dr. Hudson completed a Mental RFC Assessment, opining, in relevant part that Plaintiff was moderately limited in the ability to: understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or in proximity to others without being distracted by them; interact appropriately with the general public; get along with coworkers or peers without distracting them; and respond appropriately to changes in the work setting.  (Tr. 88-89.)  Dr. Hudson explained that Plaintiff retained "the ability to learn and perform simple, straightforward work tasks, function adequately in many types of brief, conventional employment-related social situations, and respond effectively to most routine changes that frequently occur in basic occupational settings."  (Tr. 89-90.)

On May 30, 2012, another State agency non-examining consultant, Minal Krishnamurthy, M.D., completed a Physical RFC Assessment of Plaintiff's abilities.  (Tr. 111-12.)  Dr. Krishnamurthy opined, *inter alia*, that Plaintiff could lift and/or carry fifty pounds occasionally and twenty-five pounds frequently, and he could sit for about six hours and stand and/or walk for about six hours in an eight-hour workday.  (*Id.*)

On June 13, 2012, Robert F. Schilling, Ph.D., P.A., a State agency non-examining consultant, completed a Psychiatric Review Technique, opining, in relevant part, that Plaintiff had a mild limitation in activities of daily living and a moderate limitation in social functioning and concentration, persistence, or pace.

(Tr. 110.)

On December 8, 2015, Richard Willens, Psy.D., a State agency non-examining consultant, completed a Psychiatric Review Technique, opining, in relevant part, that Plaintiff had a mild limitation in activities of daily living and a moderate limitation in social functioning and concentration, persistence, or pace. (Tr. 524-25.)  The same day, Dr. Willens completed a Mental RFC Assessment, opining, in relevant part, that Plaintiff was moderately limited in the ability to: carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or in proximity to others without being distracted by them; interact appropriately with the general public; get along with coworkers or peers without distracting them; respond appropriately to changes in the work setting; and complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 527-28.) In summary, Dr. Willens stated:

> Claimant can understand, retain, and carry out simple instructions.
> Claimant can consistently and usefully [sic] perform routine tasks on
> a sustained basis, with minimal (normal) supervision.  Claimant has
> reduced ability to cooperate effectively with [the] public and co-
> workers in completing simple tasks and transactions and would
> perform best in [a] setting with modest social demands.  Claimant
> can adjust to the mental demands of most new task settings.

(Tr. 528.)

On February 11, 2016, Renee McPhersonSalandy, Ph.D., a State agency non-examining consultant, completed a Psychiatric Review Technique, opining,

in relevant part, that Plaintiff had a mild limitation in activities of daily living and a moderate limitation in social functioning and concentration, persistence, or pace. (Tr. 537.)  The same day, Dr. McPhersonSalandy completed a Mental RFC Assessment, opining, in relevant part that Plaintiff was moderately limited in the ability to: carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or in proximity to others without being distracted by them; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them; respond appropriately to changes in the work setting; and complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 539-40.)  Dr. McPhersonSalandy adopted Dr. Willens's summary, stating:

> Claimant can understand, retain, and carry out simple instructions. Claimant can consistently and usefully [sic] perform routine tasks on a sustained basis, with minimal (normal) supervision.  Claimant has reduced ability to cooperate effectively with [the] public and co-workers in completing simple tasks and transactions and would perform best in [a] setting with modest social demands.  Claimant can adjust to the mental demands of most new task settings.

(Tr. 540.)

### 4.  Carmen Cowart

On December 26, 2013, Plaintiff's aunt, Carmen Cowart, authored a letter regarding Plaintiff's abilities.  (Tr. 283-84.)  She stated that "for many years," Plaintiff and his mother had been "very dependent on [her] to handle most of their

affairs." (Tr. 283.)  She also stated, in relevant part:

Michael has lived with his mother all of his life and becomes very uncomfortable when he is not with her.

. . .  [H]e has and continues to be extremely paranoid, often hiding himself in corners of his room.  He frequently hears voices and sees things others do not see even though he has and continues to be on medication.  Throughout the years, my [n]ephew's medication regimen has been changed frequently in the hopes that he could become stable and not require hospitalization. He has been Baker-Acted in the past for his delusional thinking with extreme highs and lows.

Michael seldom leaves his home and, if he does, much [sic] be accompanied by his mother, sister or myself because he has panic attacks and is not able to do even the smallest of tasks without supervision.  He is unable to handle any types of change in routine and becomes distraught with increased anxiety and depression when faced with anything new.  He began to frequently leave his position as bagger at Publix, retreating to hide in the back of the store away from his fellow employees and customers while experience [sic] panic attacks.  He would become lost when driving the three blocks to Publix from his home.  This is the same route he drove for many years while employed with Publix.  He becomes very anxious and confused when in traffic not only when driving but also when riding as a passenger.  He was and continues to be unable to interact appropriately with the public.

He often does not sleep for 3-4 days at a time, frequently pacing and unable [sic] to focus or maintain concentration.  His [m]other administers and monitors his medication regularly to assure his compliance.  Michael is unable to make decisions or complete tasks.  He is very slow in his thinking.  When he worked, his mother would go with him to the bank to cash his payroll check and help him monitor his money . . . .

The only time Michael goes to any family functions is when I come to get him and his mother.  When Michael is with the family, he either sits alone or watches television.  He seldom makes conversation or interacts with the other family members.  He becomes very anxious outside of his home and familiar surroundings even when he has been to the particular site other times.  . . .

He is unable to remember his doctor's appointments and must be reminded frequently to ready himself and attend in a timely manner.  There are times when he becomes anxious[,] has extreme panic attacks and is unable to follow through on attending scheduled appointments.  Many times since he was a young boy, I have had to come to his home or call him to help calm him down when he was having extreme paranoia with delusional thoughts.

(*Id.*)

On November 23, 2015, Ms. Cowart authored another letter, stating in

relevant part:

I provide all transportation and I am contacted at any time Michael Martinez has needs or when his mother needs help with Michael's care for many years.  In the last four years, I can see his condition progress [sic] and so has my involvement.  Michael lives with his mother, one brother and one sister[,] and Michael cannot be left unattended at any time.  He has a fear of being left alone and can experience an anxiety or frantic [sic] attack at any given time which requires someone to be with him all the time.  I see Michael at least every other day unless I'm needed sooner.

So far, in the 1st, 2nd and 3rd quarter of this year (2015), I have taken him to the hospital 2 times for evaluation and I have seen him have 5 setbacks so far this year (January, February, March, May, and July).  Each setback involves the 1st night of maybe 2 hours sleep; [the] 2nd and 3rd night will be with no sleep.  He gets anxious, can't stay still, moves things from one place to another place, easily get[s] confused and nervous.  I've seen this take place each time.  He tells me he hears voices and the voices won't leave him alone.

For example, on March 26, 2015, Michael had his mother call me, which he does often, and when I spoke to Michael, he said "you need to do something because I'm going to have a heart attack.  They're driving me up the wall screaming."  . . .  I drove to the house.  His eyes were extra wide open, like an owl's eyes, and said he's going out of his mind and having a heart attack.  His mother said he hasn't done any hygiene in 2 or 3 days and he hasn't slept in 2 or 3 days ([n]o one is able to sleep when Michael has anxieties and gets shaky).  I could immediately see he was having a setback because

I've seen it before with Michael. I repeatedly tell [sic] him to calm down and then drove him to the hospital. He was sitting in the back with his mother, sister and brother (none of them can drive). They had him evaluated and gave him some sedative to calm him down and asked him if he would stay and they would keep an eye on him but he refused.

He was released and then 2 days later, I came by to check on Michael and he was hostile and frustrated and all over the house walking back and forth, turning lights off and on, open[ing] and closing doors. I then drove him back to the hospital and his Lorazepam was increased for anxiety and they told me and his mother to continue with the increase and make sure to call his doctor the next day and let him know. I called the doctor and let him know and [took] him to the doctor in early April. The doctor kept the Lorazepam at the double dose and increased Seroquel to 400 mg and I then drove him and his family home.

On July 27, 2015, I had to call the doctor and let him know Michael is not getting any better. He was shaking and couldn't sit down still and pacing [sic] on the floor. . . . [H]e was still hearing voices. Michael said not as bad but still hearing voices and still gets a little upset. Michael told the doctor he noticed he gets frustrated fast. The doctor then increased the Seroquel and Invega med[ications]. The med[ications] appear to help him sleep longer and [he] is calmer so far.

(Tr. 716.)

Ms. Cowart also testified at the August 16, 2018 hearing before the ALJ. (Tr. 481-89.) She repeated her prior written statements and explained that her sister (Plaintiff's mother) was in a wheelchair due to a crippling disease, which further necessitated Ms. Cowart's involvement because she became the only driver in the family. (Tr. 482-84, 486-88.)

## C.    The ALJ's September 13, 2018 Decision

At step two of the sequential evaluation process,[7] the ALJ found that

Plaintiff had the following severe impairments: obesity, schizoaffective disorder,

generalized anxiety disorder ("GAD"), type two diabetes mellitus ("DM"), and

hypertension.  (Tr. 455.)  Then, at step three, the ALJ found that Plaintiff did not

have an impairment or combination of impairments that met or medically equaled

the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P,

Appendix 1.  (Tr. 456.)  The ALJ determined that Plaintiff had only mild limitations

in the ability to concentrate, persist, or maintain pace, and moderate limitations in

understanding, remembering, or applying information, in interacting with others,

and in adapting or managing oneself.  (Tr. 456-57.)

When determining that Plaintiff was moderately limited in interacting with

others, the ALJ acknowledged that he had "a close supportive relationship with

his family."  (Tr. 456.)  Then, in determining that the evidence did not establish

the presence of the "paragraph C" criteria of listings 12.04 and 12.06, the ALJ

stated:

> Per the evidence and hearing testimony, the record does not
> establish the claimant having minimal capacity to adapt to changes
> in his environment or to demands that are not already part of his
> daily life.  He does not live in a highly structured environment (e.g.,
> group home or institutional facility); he is independent in personal
> care, toileting, feeding, etc.; he is able to read, write and
> communicate; he has a driver's license and is able to drive short

---

[7] The Commissioner employs a five-step process in determining disability.  *See*
20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

distances without assistance.[8]  Furthermore, although the claimant's medical history is remarkable for mental hospitalization, inpatient treatment was not of an extended duration.

(Tr. 457.)

Further, before proceeding to step four, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform medium work with the following limitations:

> Specifically, the claimant is limited to performing simple tasks with little variation that take a short period to learn (up to and including 30 days), consistent with unskilled work (i.e., jobs with a Specific Vocational Preparation (SVP) level of 1 or 2).  The claimant is able to deal with the changes in a routine work setting; he is limited to work settings that do not require production-paced work; he is able to relate adequately to supervisors; he is limited to only occasional interaction with co-workers; and he must avoid contact with the public.

(*Id.*)

In making this finding, the ALJ discussed Plaintiff's diagnoses; his "regular [and] continuous" treatment with his psychiatrist, Dr. Madkaiker; his "continued[,] regular follow-up care with his primary care provider (PCP)" at the University of Florida Family Practice ("UF"); the testimony from the two hearings; the third-party statements by Plaintiff's mother and aunt; and the opinion evidence from the treating, examining, and non-examining sources.  (Tr. 457-66.)  After

---

[8] The record indicates that Plaintiff could drive only a few blocks and when he did, he was accompanied by family members.  (*See* Tr. 25-27 (noting that Plaintiff could drive his sister to the same Publix where he used to work, which was a two-minute drive); Tr. 28 (stating that Plaintiff does not drive in unfamiliar areas, because when he did, he got lost); Tr. 277.)

considering Plaintiff's and the third-parties' statements concerning the intensity, persistence, and limiting effects of Plaintiff's symptoms, the ALJ found that these statements were "not entirely consistent with the medical evidence and other evidence in the record," and were, therefore, accorded "little weight."  (Tr. 459.) The ALJ explained:

> For instance, despite the claimant's above-reported limitations, the claimant (and Ms. Cowart) indicated his prescribed medications work well in controlling his mental symptoms and stabilizing his mood.  In addition, the evidence and hearing testimony reflects the claimant is able to drive short distances to familiar places; he is able to count change and read; he is able to appropriately interact with others when he is not stress[ed] and on appropriate prescribed psych[otropic] medications; and he sleeps well while on medication. . . .
>
> Furthermore, the record fails to convey objective medical evidence or positive clinical findings to suggest the claimant's impairments reach a level of severity to support a conclusion of "disabled" under the Regulations.  Treating and examining medical sources have similarly recorded some mild to moderate findings regarding the claimant's impairments, as well as largely unremarkable medical examinations otherwise, with no acute deficits in overall physical or mental functioning.  As discussed below, the treatment record regularly denotes good control of (mental and physical) symptoms with appropriate, ongoing medical treatment, continued follow-up care with mental health providers, and compliance (Exhibits 5F and 7F-10F, 14F and 15F).

(Tr. 459-60.)

The ALJ then discussed Plaintiff's treating and examining records (*see* Tr. 460-64), which he summarized as follows:

> Overall, the above-summarized treatment records, evaluations and objective findings remain consistent with other medical entries received from the claimant's treating/examining medical sources of record since the approximate alleged onset date.  This includes

similar assessments and diagnoses; some mild/moderate findings
concerning the claimant's impairments; improvements noted with
appropriate, conventional treatment and compliance; consistent
medical directives to follow a conservative plan (i.e., exercise,
healthy diet, medication compliance, continue follow-up care, etc.);
and no substantial changes in [the] prescribed treatment regimen,
except for some occasional adjustments in medications (Exhibits 1F-
5F, 7F, 8F and 10F-17F).

(Tr. 464.)

The ALJ also addressed the medical opinion evidence. (Tr. 464-66.) As to

Dr. Madkaiker's opinions, the ALJ stated:

I find Dr. Madkaiker's medical source statements indicating the
claimant to have "marked" limitations in [the] ability to make simple
work-related decisions inconsistent with the evidence of record as a
whole, including his own treatment notes that routinely show the
claimant's mental symptoms as "controlled." Dr. Madkaiker's
treatment notes also frequently describe the claimant as "doing well"
and "functioning well" (see[,] e.g., Exhibits 5F, 15F and 17F).
Notwithstanding, most of Dr. Madkaiker's medical source statements
are supportive of the claimant's above [RFC] assessment, which
accommodate the claimant's limitations in performing certain mental
work activities. Consequently, I accord Dr. Madkaiker's medical
opinion some weight to the extent consistent with the instant
decision; and I accord great weight to his routine treatment records
in determining the claimant's [RFC].

(Tr. 465.)

The ALJ then addressed Dr. Nay's examining opinions as follows:

[S]ubsequent to his 2017 evaluation, Dr. Nay noted the claimant as
"extremely dependent on family members, and his sense of security
can become easily threated [sic] if he attempts to venture away from
his home." The claimant has poor stress coping response; and
depression and anxiety are easily exacerbated in response to even
minimal stressors. Dr. Nay further found that overall, the claimant's
symptoms of psychosis appear fairly well controlled with
medications, but could quickly deteriorate if he forgets to take
medications or if there is any change in his medication regimen. The

claimant also experiences significant impairments in short-term/immediate memory, attention/concentration, and delayed memory/recall.  As applied to a vocational setting, Dr. Nay concluded the claimant would require constant reminders and cues in order to complete simple tasks; and that the claimant's very limited work history suggests he was unable to continue performing a very simple, routine job (i.e., []bagger), as his psychiatric symptoms and poor stress coping response made any type of work impossible.  Based on all evidence reviewed, evaluation findings, behavioral observations and current testing, Dr. Nay opined the claimant is "totally disabled" from a psychological perspective[] and is unable to perform in any job setting on a full-time basis (Exhibit 16F).

Here, I find Dr. Nay's above evaluation and medical opinion unsupported by the medical evidence as a whole.  Specifically, as discussed above, the claimant's routine PCP treatment records and contemporaneous progress notes from his psychiatrist, Dr. Madkaiker, reflect no more than moderate mental symptoms/difficulties.  Therefore, I accord Dr. Nay's medical opinion little weight.

(*Id.*)

The ALJ also considered the findings by the State agency non-examining consultants, Dr. Schilling and Dr. Krishnamurthy, who reviewed the file in June and May of 2012, respectively, and found Plaintiff not disabled.  (Tr. 466.)  The ALJ weighed these opinions as follows:

Here, I find Dr. Schilling's psychological assessment an accurate summary of the medical evidence as a whole, and therefore accord his medical opinion significant probative weight in determining the claimant's relevant mental limitations.

. . .  Here, I find Dr. Krishnamurthy's medical assessment an accurate summary of the file as a whole, and accord his medical opinion substantial weight to the extent consistent with the instant decision.

(*Id.*)  Then, the ALJ stated:

In sum, the State agency physical and psychological assessments, in addition to the claimant's and third party['s] statements/testimony and medical records presented, fail to establish that the claimant is disabled. Although he may experience some significant limitations resulting from his impairments, he has not established that these symptoms are of such intensity and frequency that he is unable to work. Thus, the limitations that do exist are accommodated within the [RFC] assessment.

(*Id.*)

At step four, the ALJ determined that Plaintiff was unable to perform any past relevant work. (Tr. 467.) At step five, considering Plaintiff's age,[9] education,[10] work experience, and RFC, as well as the testimony of the vocational expert ("VE"), the ALJ determined that there were jobs existing in significant numbers in the national economy that Plaintiff could perform, such as the jobs of hand packager, laundry worker, and cleaner II. (Tr. 467-68.) As noted in the ALJ's decision, all of these representative occupations are medium duty, unskilled jobs with an SVP of 2. (Tr. 468.)

### D. Analysis

The Court agrees with Plaintiff that the ALJ's RFC assessment is not supported by substantial evidence. First, the ALJ improperly evaluated the opinion evidence. The ALJ gave significant or substantial weight to the opinions of two State agency non-examining consultants, Dr. Schilling and Dr.

---

[9] Plaintiff was born in 1967. (Tr. 467.)

[10] Plaintiff completed high school but was in special education classes. (Tr. 467, 845, 852.)

Krishnamurthy, who reviewed the record in June and May of 2012, respectively.[11]  The ALJ explained that these consultants' assessments were "an accurate summary of the medical evidence [or the file] as a whole."  (Tr. 466.)  However, these assessments were clearly outdated as they did not take into account, *inter alia*, the treatment records for the remainder of 2012 and through 2018, Dr. Madkaiker's December 5, 2012 MSS, Dr. Nay's November 2017 consultative report and MSS, or Ms. Cowart's statements from either 2013 or 2015.  Given that the assessments by Dr. Schilling and Dr. Krishnamurthy were clearly based on an incomplete record, the ALJ's statement that these assessments represented "an accurate summary of the medical evidence [or the file] as a whole," is not supported by substantial evidence.

Further, the ALJ's evaluation of the treating and examining opinions is not supported by substantial evidence.  As an initial matter, it appears that the ALJ essentially ignored the consistency between Dr. Madkaiker's opinions, Dr. Nay's opinions and findings, and the third-party statements by Ms. Cowart.  When discounting Dr. Madkaiker's opinions as inconsistent with his own treatment notes, the ALJ stated that the treatment notes showed Plaintiff had no more than

---

[11] Although the ALJ referenced only the assessments completed by Dr. Schilling and Dr. Krishnamurthy, there were three other State agency consultants who issued opinions in this case, one of which predated Dr. Krishnamurthy's assessment and the other two assessments were issued in December 2015 and February 2016, respectively.  Interestingly, the ALJ did not discuss these more recent assessments.  Also, while the ALJ referenced an assessment by "P.S. Krishnamurthy, M.D." in his decision (Tr. 466), the record includes an assessment by "Minal Krishnamurthy, M.D." (Tr. 111-12).

moderate difficulties, his symptoms were controlled, and he was doing well.  (Tr. 460, 465.)

However, despite reporting "moderate improvement as a result of [his] medications" (Tr. 318), Plaintiff was still depressed, anxious, with poor to fair insight and judgment; and, at times, had hallucinations, impaired memory, slow speech with low volume, was confused, labile, distracted, lethargic, and slightly disheveled, requiring continuous treatment and support from his family.  (*See, e.g.*, Tr. 319-43, 346, 825, 827, 829, 831, 833-34, 848, 851, 855, 998, 1000, 1002, 1004, 1006, 1008, 1010, 1032-33; *see also* Tr. 288 (noting that in August of 2010, Plaintiff was partially cooperative, disorganized, had poor insight and judgment, paranoia, auditory hallucinations, impaired concentration, and thought blocking); Tr. 852 (reporting auditory hallucinations and racing thoughts as of May 8, 2014); Tr. 841 (noting that as of January 7, 2015, Plaintiff was hearing voices and was not sleeping well); Tr. 836-37 (noting that as of March 25, 2015, Plaintiff's insight and judgment were poor, his anxiety was out of control, he experienced thought blocking, hallucinations, paranoid delusions, rapid mood swings, less energy and motivation, panic symptoms, and increased agitation and hypervigilance, despite taking his medications as prescribed); Tr. 829 (noting that as of July 27, 2015, Plaintiff was anxious, could not stay still, was repeating himself, and felt "nobody ha[d] been helpful to him," despite taking his medications as prescribed); Tr. 917 (noting hallucinations, behavioral problems, confusion, and anxiety/nervousness as of November 18, 2015); Tr. 1030 (noting

that as of April 10, 2018, Plaintiff was anxious, depressed, easily distracted, slightly disheveled, with slow speech, and fair energy and motivation, among other symptoms).)

Significantly, although the ALJ gave great weight to Dr. Madkaiker's "routine treatment records" (Tr. 465), those records reflect that Plaintiff was accompanied by a family member anywhere he went, including at his doctor's visits. (*See* Tr. 825, 827, 831, 833-34, 836-37, 839, 841-44, 846, 848, 852, 855, 998, 1000, 1002, 1004, 1006, 1030; *see also* Tr. 1008 ("He has had to travel with his mother. He gets very anxious around people."); Tr. 1010 ("He needs to be accompanied by his family.").)[12] Moreover, Plaintiff's mother, aunt, and/or sister were not merely providing transportation; rather, they were actively participating in the decision-making process regarding his treatment, while also relaying his symptoms and medical history given that Plaintiff was "a poor historian" and could not even recall the name of his psychiatrist at one point. (Tr. 287, 379, 400, 719, 805, 920.)

The ALJ's decision seems to acknowledge Plaintiff's reliance on his family members. (*See, e.g.*, Tr. 458 (stating Plaintiff "never goes anywhere alone[,]

---

[12] The treatment records from the PCP also show that Plaintiff was accompanied by one or more family members during his appointments. (*See, e.g.*, Tr. 301, 307, 313, 354, 360, 365, 367, 371, 379, 391, 397, 400, 404, 441, 865, 880, 891, 916, 920, 938; *but see* Tr. 383, 389, 395, 403, 409 & 440 (failing to mention whether a family member was present).) Further, the record, as a whole, consistently shows that Plaintiff could not "go or do anything alone." (Tr. 277; *see also* Tr. 25 (stating "my mom's always with me and helping me"); Tr. 14, 19-20, 23, 35.)

including doctor['s] appointments, food shopping, church[,] etc."); Tr. 459 ("Ms.

Cowart similarly indicated the claimant requires assistance with 'everything'; he

cannot go anywhere without his family; he is unable to handle any type of change

in routine; he is unable to interact appropriately with the public; and 'he cannot

adjust to anything' without close relatives (i.e., mother, sister or aunt) [being]

present. . . . Ms. Cowart testified she or the claimant's mother/sister take[] the

claimant everywhere[,] including [to] doctor['s] appointments and shopping . . .

and she even had to assist him in going to the bathroom at the doctor's [office]

because he could not find the light switch and just waited silently in the bathroom

until she could come help him . . . ."); Tr. 460, 461 & 462 (noting that Plaintiff was

accompanied by his mother and/or aunt to his doctor's appointments); Tr. 462

(noting that Plaintiff "has had to travel with his mother"); Tr. 463 (noting that

Plaintiff "needs to be accompanied by his family"); Tr. 465 (noting Dr. Nay's

observation that Plaintiff was "extremely dependent on family members, and his

sense of security [could] become easily [threatened] if he attempt[ed] to venture

away from his home").)

Further, the ALJ's decision seems to reflect the active role that Plaintiff's

relatives played in his treatment. (*See* Tr. 460-61 ("The mother and aunt

reported the claimant 'had to have [his] psych[otropic] med[ications] adjusted due

to too many setbacks of recent'; the claimant had 'not taken med[ications] that

morning [due to] fasting for labs; [and] he was very nervous coming in.'"); Tr. 461

(noting that "the claimant's 'mother and aunt [we]re agreeable to [liver testing]

and imaging,'" and that the "'mother and aunt prefer[red] to consult with [the] psych[iatrist] and [inquire about] possible med[ication] interactions prior to starting [the treatment] . . .'").)

Despite noting all these records, the ALJ did not explain why he apparently rejected Plaintiff's need to have a family member present practically at all times and, instead, concluded that Plaintiff did "not live in a highly structured environment" because he was not in a "group home or institutional facility." (Tr. 457.) It appears that in weighing the evidence and assessing Plaintiff's limitations, the ALJ simply ignored the reality of Plaintiff's structured environment. Although Plaintiff was technically not in a group home or at an institutional facility, he was constantly surrounded by his mother, sister, and/or aunt, whose presence alleviated his mental symptoms and helped him cope when outside the confines of his home. (*See, e.g.*, Tr. 367 (stating that Plaintiff's mother was accompanying him to his appointment and he "seem[ed to be] calmed by her responses and interruption"); *see also* Tr. 459 (reciting Ms. Cowart's statement that Plaintiff's medications "help him stay calm *so long as he is in [the] presence of close family*") (emphasis added).)

Also, it appears that the ALJ assumed that Plaintiff's functioning *with* the support of his relatives was his baseline level of functioning. This assumption seems to have influenced the ALJ's decision as a whole. Assuming the ALJ believed that Plaintiff's medications alone sufficiently controlled his symptoms, the record seems to paint a different picture. Specifically, it indicates that during

the relevant period, Plaintiff did not work at all,[13] and was, thus, able to control his environment, stressors, and activities; and also that he relied on his relatives for practically everything that he needed to function – from medication and appointment reminders, to transportation, meals, emotional support, and constant presence anytime he needed to leave the house.  (*See* Tr. 277.)

Despite staying at home, away from stressors, and taking all of his medications as prescribed, Plaintiff nevertheless encountered "setbacks" requiring medication adjustments and/or hospitalization.  (*See, e.g.*, Tr. 802-05 (noting a visit to the emergency room on March 28, 2015 for worsening symptoms, such as depression, anxiety, lack of sleep, suicidal thoughts, and auditory hallucinations, after starting medications a few days earlier); Tr. 813-17 (noting a visit to the emergency room on March 26, 2015 for worsening mental symptoms after adjustment of his medication the day before); Tr. 285-87 (showing a psychiatric admission from August 6 to August 12, 2010 for acute exacerbation of Plaintiff's schizophrenia, paranoid type, and noting "extensive outpatient and inpatient psychiatric care in the past"); Tr. 400 (noting another mental health hospitalization in 2008).)  In other words, Plaintiff's "setbacks" occurred *while* he was taking several psychotropic medications, which he had been doing regularly and consistently since approximately 1989 (*see* Tr. 28-29); *while* he was not working; and *while* he relied on his family members for

---

[13] Plaintiff's testified that his work as a bagger at Publix, which was the only job he had held, aggravated his symptoms.  (*See* Tr. 11-13, 31-32.)

practically everything that he needed to function. (*See* Tr. 277.)

In addition, the above-cited records lend support to Dr. Nay's opinion that Plaintiff had poor coping skills and was extremely dependent on his family members, which the ALJ discounted as inconsistent with the treatment records of Dr. Madkaiker and the PCP. Also, the tests administered by Dr. Nay, which showed, *inter alia*, significant difficulties with memory and retention of information, seem to undermine the ALJ's statement that there was no objective medical evidence to support Plaintiff's claim of disability. Notably, Dr. Nay's opinions, which were the most recent examining opinions in the record and were rendered years after the State agency non-examining consultants' assessments, were based on the results of the MMSE, the RBANS, the CCSM, a review of pertinent records, and Dr. Nay's own observations and clinical interview of Plaintiff. The ALJ seemed to ignore the relevancy and consistency of Dr. Nay's opinions with the other medical and non-medical opinions in the file. In sum, the ALJ's reasons for discounting the treating and examining sources' opinions were not supported by substantial evidence in the record. In light of this conclusion, the Court will not separately address the third-party statements in the record, but on remand, the ALJ should re-consider all medical and non-medical opinions in conducting the five-step sequential evaluation process.

Accordingly, it is **ORDERED**:

1. The Commissioner's decision is **REVERSED and REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g), with instructions to the ALJ to

conduct the five-step sequential evaluation process in light of all the evidence, including the opinion evidence from treating, examining, and non-examining sources, as well as the third-party statements, and conduct any further proceedings deemed appropriate.

2.    The Clerk of Court is directed to enter judgment accordingly, terminate any pending motions, and close the file.

3.    In the event that benefits are awarded on remand, any § 406(b) or § 1383(d)(2) fee application shall be filed within the parameters set forth by the Order entered in *In re: Procedures for Applying for Attorney's Fees Under 42 U.S.C. §§ 406(b) & 1383(d)(2)*, Case No.: 6:12-mc-124-Orl-22 (M.D. Fla. Nov. 13, 2012).  This Order does not extend the time limits for filing a motion for attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412.

**DONE AND ORDERED** at Jacksonville, Florida, on March 10, 2020.

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

Counsel of Record